1
2
3
4
5
6
7
8                           UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SANDRA JEAN CANNON,                      No.  2:14-cv-0511-WBS-CKD

12                  Plaintiff,

13          v.                                FINDINGS AND RECOMMENDATIONS

14   CAROLYN W. COLVIN, Acting
     Commissioner of Social Security,
15
                     Defendant.
16

17

18          Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

19   ("Commissioner") denying applications for Disability Income Benefits ("DIB") and

20   Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act

21   ("Act"), respectively.  For the reasons discussed below, the court will recommend that plaintiff's

22   motion for summary judgment be denied and that the Commissioner's cross-motion for summary

23   judgment be granted.

24   BACKGROUND

25          Plaintiff, born March 13, 1965, applied on April 28, 2010 for DIB and SSI, alleging

26   disability beginning April 21, 2009.  Administrative Transcript ("AT") 13, 95, 183-94.  Plaintiff

27   alleged she was unable to work due to chronic regional pain syndrome of the right upper and

28   lower extremities, a right elbow injury, chronic back pain secondary to lumbar spinal stenosis and

                                                    1

degenerative disc disease, and depression.  AT 267-68.  In a decision dated January 7, 2013, the ALJ determined that plaintiff was not disabled.[1]  AT 13-24.  The ALJ made the following findings (citations to 20 C.F.R. omitted):

> 1.  The claimant meets the insured status requirements of the Social Security Act as of September 30, 2014.
>
> 2.  The claimant has not engaged in substantial gainful activity since April 21, 2009, the amended alleged onset date.
>
> 3.  The claimant has the following severe impairments:  right upper extremity impairment, degenerative disc disease; and marijuana abuse.
>
> 4.  The claimant does not have an impairment or combination of

---

[1]      Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. § 401 et seq.   Supplemental Security Income is paid to disabled persons with low income.  42 U.S.C. § 1382 et seq.  Both provisions define disability, in part, as an "inability to engage in any substantial gainful activity" due to "a medically determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).  A parallel five-step sequential evaluation governs eligibility for benefits under both programs.  See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S. 137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
>
> Step two:  Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
>
> Step three:  Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App.1?  If so, the claimant is automatically determined disabled.  If not, proceed to step four.
>
> Step four:  Is the claimant capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.
>
> Step five:  Does the claimant have the residual functional capacity to perform any other work?  If so, the claimant is not disabled.  If not, the claimant is disabled.

Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

The claimant bears the burden of proof in the first four steps of the sequential evaluation process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the burden if the sequential evaluation process proceeds to step five.  Id.

impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b), which would allow her to alternate sitting and standing at will, except that she would be precluded from shoulder height work with the right upper extremity.

6.  The claimant is unable to perform any past relevant work.

7.  The claimant was born on March 13, 1965 and was 44 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date.

8.  The claimant has at least a high-school education and is able to communicate in English.

9.  Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled.

10.  Considering the claimant's age education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.  The claimant has not been under a disability, as defined in the Social Security Act, from April 21, 2009 through the date of the decision.

AT 15-23.

ISSUES PRESENTED

Plaintiff argues that the ALJ committed the following errors in finding plaintiff not disabled: (1) abused his discretion and demonstrated bias during the administrative hearing in violation of his duty to provide a full and fair hearing; (2) improperly included "marijuana abuse" as a "severe" impairment and failed to include plaintiff's bipolar disorder and depression as "severe" impairments at step two; (3) failed to properly evaluate plaintiff's chronic regional pain syndrome ("CRPS") pursuant to Social Security Ruling ("SSR")[2] 03-02p; (4) failed to fully

---

[2] Social Security Rulings "represent precedent final opinions and orders and statements of policy and interpretations that we have adopted." 20 C.F.R. § 402.35(b)(1). Social Security Rulings are "binding on all components of the Social Security Administration." Heckler v. Edwards, 465 U.S. 870, 873 n.3 (1984); cf. Silveira v. Apfel, 204 F.3d 1257, 1260 (9th Cir. 2000) ("This court defer[s] to Social Security Rulings ... unless they are plainly erroneous or inconsistent with the Act or regulations").

develop the record by not recontacting Dr. Whitten, a consultative examining psychiatrist, for clarification of his opinion; (5) erroneously determined plaintiff's residual functional capacity ("RFC") based on an improper rejection of the opinions of Dr. Otani and Dr. Sahagian; (6) improperly assessed the credibility of plaintiff's testimony;  (7) improperly assessed the credibility of plaintiff's sister's lay testimony; and (8) provided an improper hypothetical to the vocational expert ("VE") at step five.

LEGAL STANDARDS

The court reviews the Commissioner's decision to determine whether (1) it is based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir. 1999).  Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v. Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Orn v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities." Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted). "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational interpretation." Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

The record as a whole must be considered, Howard v. Heckler, 782 F.2d 1484, 1487 (9th Cir. 1986), and both the evidence that supports and the evidence that detracts from the ALJ's conclusion weighed.  See Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).  The court may not affirm the ALJ's decision simply by isolating a specific quantum of supporting evidence.  Id.; see also Hammock v. Bowen, 879 F.2d 498, 501 (9th Cir. 1989).  If substantial evidence supports the administrative findings, or if there is conflicting evidence supporting a finding of either disability or nondisability, the finding of the ALJ is conclusive, see Sprague v. Bowen, 812 F.2d 1226, 1229-30 (9th Cir. 1987), and may be set aside only if an improper legal standard was applied in weighing the evidence.  See Burkhart v. Bowen, 856 F.2d 1335, 1338 (9th Cir. 1988).

/////

4

1    ANALYSIS

2        A.   Plaintiff Provides Insufficient Evidence of Bias

3        First, plaintiff argues that several statements made by the ALJ during the administrative

4    hearing demonstrate that the ALJ acted in a biased manner when considering plaintiff's

5    application, which amounted to an abuse of discretion.  Plaintiff's argument is without merit.

6        "ALJs and other similar quasi-judicial administrative officers are presumed to be

7    unbiased.  This presumption can be rebutted by a showing of conflict of interest or some other

8    specific reason for disqualification."  Rollins v. Massanari, 261 F.3d 853, 857-58 (9th Cir. 2001)

9    (quoting Verduzco v. Apfel, 188 F.3d 1087, 1089 (9th Cir. 1999)) (citation and internal quotation

10   marks omitted).  Mere "'expressions of impatience, dissatisfaction, annoyance, and even anger,

11   that are within the bounds of what imperfect men and women . . . sometimes display'" are

12   insufficient to establish that an ALJ acted with bias when considering a claimant's case.  Id. at

13   858 (quoting Liteky v. United States, 510 U.S. 540, 555-56 (1994)).  Instead, a claimant must

14   "show that the ALJ's behavior, in the context of the whole case, was 'so extreme as to display

15   clear inability to render fair judgment.'"  Id. (quoting Liteky, 510 U.S. at 551).

16       Here, plaintiff asserts that the ALJ's statement in his decision that he found Dr.

17   Sahagian's report "offensive" and statements during the administrative hearing that implied that

18   plaintiff was a "doper" demonstrates bias.  However, such statements and insinuations when

19   viewed in the context of this case as a whole are not "so extreme as to display clear inability to

20   render fair judgment."  Liteky, 510 U.S. at 551; Rollins, 261 F.3d at 857-58 (holding that the

21   ALJ's comments concerning a doctor's report that exhibited sarcasm and impatience did not rise

22   to the level of bias).  Nothing in the record indicates that the ALJ failed to render a fair judgment

23   that utilized the appropriate standards and that was based on substantial evidence in the record.

24   The ALJ's use of several arguably indelicate comments concerning plaintiff and one of her

25   treating physicians, without more, is insufficient to demonstrate bias.  Accordingly, plaintiff's

26   arguments that the ALJ exhibited bias are not well taken.

27   /////

28   /////

5

B.   The ALJ did not Err in Considering Plaintiff's Impairments at Step Two

Next, plaintiff asserts that the ALJ erred at step two of his analysis by finding "marijuana abuse" to be a "severe" impairment and not including bipolar disorder and depression in the list of plaintiff's "severe" impairments.

An impairment is "not severe" only if it "would have no more than a minimal effect on an individual's ability to work, even if the individual's age, education, or work experience were specifically considered."  SSR 85-28.  The purpose of step two is to identify claimants whose medical impairment is so slight that it is unlikely they would be disabled even if age, education, and experience were taken into account.  Bowen v. Yuckert, 482 U.S. 137 (1987).  "The step-two inquiry is a de minimis screening device to dispose of groundless claims."  Smolen v. Chater, 80 F.3d 1273, 1290 (9th Cir. 1996); see also Edlund v. Massanari, 253 F.3d 1152, 1158 (9th Cir. 2001).  Impairments must be considered in combination in assessing severity.  20 C.F.R. § 404.1523.

Here, plaintiff asserts that the ALJ erred by not including bipolar disorder and depression as "severe" impairments despite the existence of evidence in the record indicating that plaintiff had been diagnosed with these impairments.  Although the burden is on plaintiff at step two of the sequential evaluation, see Tidwell v. Apfel, 161 F.3d 599, 601 (9th Cir. 1998), counsel for plaintiff has offered no meaningful argument in support of the claim that the ALJ erred at step two.  A mere recitation of medical diagnoses does not demonstrate how each of the conditions included in that recitation impacts plaintiff's ability to engage in basic work activities.  Without any indication that these additional impairments would have caused limitations on plaintiff's ability to engage in basic work activities beyond the limitations assessed by the ALJ, plaintiff has not met her burden in demonstrating that the ALJ should have determined that these impairments were "severe."

Moreover, even assuming arguendo that the ALJ technically erred by not finding a severe bipolar disorder and depression at step two, such error is harmless if the ALJ proceeded to consider the effects of that impairment at subsequent steps.  See Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007).  Here, because the ALJ found another mental impairment to be severe at step

6

two, the ALJ proceeded to subsequent steps of the sequential disability evaluation process.

Plaintiff asserts that the non-inclusion of these mental impairments as "severe" impairments at step two was not harmless because the ALJ's failure to include the limitations caused by these impairments in his hypothetical to the VE at step five meant that the VE's opinion lacked evidentiary value to support the ALJ's finding that there were jobs in the national economy that plaintiff could perform given his limitations. However, as noted above, plaintiff merely argues that there is evidence in the record that these impairments were diagnosed, and does not demonstrate that they negatively impacted plaintiff's ability to perform basic workplace activities.

Plaintiff further claims that there was insufficient evidence in the record to show that plaintiff had "severe" alcohol and marijuana abuse. This argument also lacks merit. As an initial matter, contrary to plaintiff's assertion, the ALJ did not find that plaintiff had "severe" alcohol abuse. Rather, he found only that plaintiff had "severe" marijuana abuse. Plaintiff is correct that the ALJ did state the following in his step two discussion: "The undersigned does not find, however, that the claimant has a mental impairment, *independent of drug or alcohol abuse*, which is 'severe.'" AT 16 (emphasis in original). However, the ALJ only listed marijuana abuse in his statement of plaintiff's severe impairments. AT 15. Given that the ALJ used the word "or" rather than "and" when making this mention of alcohol abuse in his decision, it can be implied that the ALJ only considered marijuana abuse to be sufficiently severe to merit inclusion as a "severe" impairment at step two. See Magallanes v. Bowen, 881 F.2d 747, 755 (9th Cir. 1989) (noting that a reviewing court may "draw[ ] specific and legitimate inferences from the ALJ's opinion.").

With respect to the ALJ's finding of "severe" marijuana abuse, substantial evidence in the record supported such a finding. Plaintiff's treatment records are replete with references to "cannabis abuse" and plaintiff herself testified to smoking marijuana during the relevant time period. See, e.g., AT 40, 562, 705, 713-14, 720, 727, 734, 738, 756, 763, 771, 799, 803, 823,

////

////

7

1   839, 842.[3]  In sum, the ALJ's severity determination at step two was supported by substantial

2   evidence.

3         Moreover, even assuming arguendo that the ALJ erred in finding that plaintiff had

4   "severe" marijuana abuse, any such error would have been harmless.  If this condition were to

5   have been found to be less than severe, or non-existent, as plaintiff suggests, then plaintiff

6   necessarily would have been less impaired than what the ALJ determined.  In other words, the

7   absence of an additional "severe" impairment would have indicated that plaintiff had a *greater*

8   ability to perform basic work activities.  Accordingly, even if the ALJ had erred, any such error

9   would have been harmless.

10        Plaintiff also claims that the ALJ failed to consider two clinician's records from the

11   Feather River Health Clinic dated August 19, 2009 and August 20, 2009, respectively, when

12   considering plaintiff's impairments at step two.  AT 339-41.  Contrary to this assertion, however,

13   the ALJ based his step two assessment, and indeed his overall determination, upon a "careful

14   consideration of the entire record," which would include these two records.  AT 15.  Furthermore,

15   the ALJ was not required to specifically "discuss evidence that is neither significant nor

16   probative."  Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003).  Neither of

17   the records plaintiff claims the ALJ omitted from consideration were particularly significant or

18   probative because they cover only a two-day period, do not provide any medically significant

19   findings that were not found elsewhere in the record, and were not issued by an acceptable

20   medical source.  Therefore, plaintiff's assertion is without merit.

21   _____

22   [3] Plaintiff argues in her reply that the "problem lists" included in the medical records provided by
     Feather River Clinic that repeatedly include "cannabis abuse" as one of plaintiff's impairments do
23   not actually represent that plaintiff continued to use marijuana up through late 2012 like they
     suggest.  ECF No. 15 at 29.  Plaintiff asserts that, instead, these records represented only an
24   "ongoing history of every complaint made to the [Clinic]" and that any previously-listed
     impairment would continue to be included in these lists "unless the patient specifically asks to
25   have them removed."  Id.  Plaintiff claims that her counsel contacted the Clinic and confirmed
     that this is the Clinic's practice after he had filed plaintiff's motion for summary judgment.  Id. at
26   9.  However, there is no evidence in the administrative record that was before the ALJ of this
     purported practice.  Furthermore, even assuming this was the practice, there was still other
27   substantial evidence in the record to support the ALJ's finding that plaintiff suffered from
     "severe" marijuana abuse.
28

C.     The ALJ Properly Assessed the Evidence in the Record Concerning Plaintiff's Claim of CRPS

Third, plaintiff argues that the ALJ erred by not finding that plaintiff had CRPS despite the existence of evidence in the record that supported a finding that plaintiff did suffer from CRPS pursuant to the Commissioner's guidelines articulated in SSR 03-02p.

SSR 03-02p defines CRPS as "a constellation of symptoms and signs that may occur following an injury to bone or soft tissue" that can arise from a precipitating injury, which is often minor in nature, and cause the individual to suffer from pain exceeding that typically associated with the injury he or she sustained.  2003 WL 22399117.  Under the Commissioner's guidelines articulated in SSR 03-02p, CRPS can be established through a claimant's "persistent complaints of pain that are typically out of proportion to the severity of" a documented precipitating injury and at least one of the following clinically documented signs in the affected region of the body at any time following the injury:

> Swelling;
> autonomic instability—seen as changes in skin color or texture, changes in sweating (decreased or excessive sweating), changes in skin temperature, and abnormal pilomotor erection (gooseflesh);
> Abnormal hair or nail growth (growth can be either too slow or too fast);
> Osteoporosis; or
> Involuntary movements of the affected region of the initial injury

Id.  SSR 03-02p further provides that these clinically documented signs are often transient and, therefore, "may be present at one examination and not appear at another."  Id.  Consequently, the existence of only transient findings of these signs in the medical record "do[es] not affect a finding that a medically determinable impairment is present."  Id.

Plaintiff contends that the ALJ improperly ignored longitudinal record of plaintiff's CRPS presented by the medical evidence, which plaintiff asserts contains evidence that plaintiff exhibited the signs and symptoms set forth in SSR 03-02p.  Plaintiff argues that the record indicates that plaintiff began exhibiting signs of CRPS in her right upper extremity in early 2008 after she had hit her right elbow on a car door and that her symptoms and signs worsened as time

9

1   progressed.  However, the only physician to formally diagnose plaintiff with CRPS was Dr.

2   Sahagian, whose opinion the ALJ properly discounted for the reasons discussed below.  Prior to

3   Dr. Sahagian taking over as plaintiff's treating physician, Dr. Filibrandt, plaintiff's former

4   treating physician, diagnosed plaintiff with "probable CRPS" and noted that plaintiff's "right

5   upper extremity [was] warmer than [her] left."  AT 362-63.  However, he also noted that

6   plaintiff's right arm had "no obvious swelling" and "no focal hot joints."  AT 362.

7          Furthermore, none of the other physicians who examined plaintiff or reviewed plaintiff's

8   medical records during the relevant period found that plaintiff had CRPS.  <u>See</u> AT 90, 547, 554,

9   654, 840.  In particular, Dr. Otani found that plaintiff did not suffer from any of the symptoms of

10  CRPS during his consultative examination of plaintiff on October 21, 2010.  AT 547 ("There is

11  no clinical evidence of the claimed complex regional pain syndrome of the upper right

12  extremity.").  Dr. Otani examined plaintiff again in May of 2011 and again noted that he did not

13  "see the swelling, discoloration, or temperature difference commonly seen with CRPS."  AT 840.

14  Dr. Otani also noted each time he examined her that plaintiff appeared to exaggerate her pain,

15  presented multiple non-physiologic inconsistencies during her physical examination, and made

16  subjective complaints that appeared to be greater than the objective findings.  <u>E.g.</u>, AT 547

17  (noting that plaintiff had "multiple inconsistencies in her physical examination" and made

18  "[s]ubjective complaints [that] appear[ed] to be greater than objective findings."), 834 (noting

19  that plaintiff "demonstrate[d] an exaggerated pain behavior which resolve[d] with distraction").

20  Plaintiff's other physicians, including Dr. Sahagian, also noted that plaintiff had a tendency to

21  exaggerate her symptoms and the pain caused by her impairments.  <u>See, e.g.</u>, 554, 558, 619, 659.

22          While the record does also contain some evidence that plaintiff sporadically exhibited a

23  temperature difference between her right and left upper extremities, with her right being

24  somewhat warmer than her left, and minor swelling in her right hand, <u>see</u> AT 348, 351, 362, the

25  balance of the overall medical record indicates that plaintiff did not have CRPS.  Plaintiff is

26  correct in asserting that the standards under SSR 03-02p permit a finding of CRPS on the basis of

27  just one of the signs listed in that ruling.  However, the fact that only one physician during the

28  entire relevant period actually diagnosed plaintiff with this syndrome and the fact that much of

10

the medical evidence in the record documents that plaintiff did not exhibit the signs commonly

associated with CRPS means that there existed substantial evidence in the record to support the

ALJ's determination even though plaintiff may have sporadically exhibited at least one of the

signs.  Accordingly, substantial evidence supported the ALJ's finding that plaintiff did not have

CRPS.

Nevertheless, plaintiff argues that the fact that the evidence in favor of a finding of CRPS

under the standards of SSR 03-02p appears in the record only sporadically does not diminish the

impact of this evidence because the transitory nature of CRPS means that its signs may manifest

themselves only intermittently.  While plaintiff is correct that SSR 03-02p provides that the

clinical signs of CRPS may be manifested intermittently, there is still substantial evidence in the

record to support the ALJ's determination that plaintiff did not suffer from CRPS.  Whether a

claimant has CRPS is determined "using the sequential evaluation process, just as for any other

impairment."  SSR 03-02p, 2003 WL 22399117.  Here, the ALJ addressed plaintiff's CRPS claim

using this framework and reasonably concluded that plaintiff did not suffer from this impairment.

Even though the evidence to which plaintiff cites could potentially support a finding that plaintiff

suffered from CRPS under the standards provided by SSR 03-02p, the fact that substantial

evidence in the record supported the ALJ's interpretation that plaintiff did not suffer from CRPS

means that the court must accept the ALJ's conclusion.  See Tommasetti, 533 F.3d at 1038 ("The

court will uphold the ALJ's conclusion when the evidence is susceptible to more than one rational

interpretation.").  Accordingly, the ALJ did not violate SSR 03-02p or otherwise err in concluding

that plaintiff did not have CRPS.

D.      The ALJ Fully Developed the Record

Plaintiff next argues that the ALJ failed to fulfill his duty to fully develop the record

because he did not recontact Dr. Whitten, an examining psychiatrist, to obtain clarification of his

opinion that plaintiff "may not" be able to engage in certain work-related activities such as

interacting with coworkers and customers on a consistent basis, performing tasks in a consistent

manner, and completing a workweek without interruption.  AT 562-63.  Plaintiff's argument

lacks merit and the ALJ was not required to contact Dr. Whitten for further clarification of his

1    opinion because Dr. Whitten's opinion as to the impact of plaintiff's mental impairments, when

2    viewed as whole, was not ambiguous.

3        Disability hearings are not adversarial.  See DeLorme v. Sullivan, 924 F.2d 841, 849 (9th

4    Cir. 1991); see also Crane v. Shalala, 76 F.3d 251, 255 (9th Cir. 1996) (ALJ has duty to develop

5    the record even when claimant is represented).  Evidence raising an issue requiring the ALJ to

6    investigate further depends on the case.  Generally, there must be some objective evidence

7    suggesting a condition that could have a material impact on the disability decision.  See Smolen

8    v. Chater, 80 F.3d 1273, 1288 (9th Cir. 1996); Wainwright v. Secretary of Health and Human

9    Services, 939 F.2d 680, 682 (9th Cir. 1991).  "Ambiguous evidence . . . triggers the ALJ's duty to

10   'conduct an appropriate inquiry.'"  Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001)

11   (quoting Smolen, 80 F.3d at 1288.)

12       Here, plaintiff asserts that Dr. Whitten's opinion that plaintiff "may not" be able to engage

13   in certain workplace activities on a consistent basis was equivocal, therefore requiring the ALJ to

14   recontact him to obtain clarification as to what he meant by this opinion.  However, when these

15   statements are viewed in the context of Dr. Whitten's overall opinion regarding plaintiff's mental

16   health and the impact it had on plaintiff's ability to perform basic work activities as a whole, there

17   is no ambiguity.  In the section titled "functional ability," Dr. Whitten's opinion concludes with

18   the following with respect to the impact of plaintiff's impairments on her ability to perform work:

19   "[i]f you were to consider the mental problems in and of themselves, it appears that they would

20   have a moderate impact on her ability to carry out those activities and responsibilities required for

21   those jobs she has been suited for in the past."  AT 563.  This makes it clear that Dr. Whitten

22   believed that plaintiff's mental impairments had a moderate impact on plaintiff's ability to

23   perform work-related activities, including interacting with coworkers and customers, performing

24   work tasks in a consistent manner, and completing a workweek without interruption.  Because Dr.

25   Whitten's opinion does not contain the ambiguity plaintiff asserts, there was no obligation on the

26   ALJ's part to recontact this physician to obtain clarification.

27   /////

28   /////

1        E.      The ALJ Properly Determined Plaintiff's RFC

2              Next, plaintiff argues that the ALJ erred in his assessment of the medical opinions in the

3    record.  Specifically, plaintiff asserts that the ALJ erroneously assigned "no weight" to the

4    opinion of Dr. Sahagian, one of plaintiff's treating physicians.  She also argues that the ALJ erred

5    further by discrediting the functional restrictions opined by Dr. Otani, a consultative examining

6    physician.

7              The weight given to medical opinions depends in part on whether they are proffered by

8    treating, examining, or non-examining professionals.  Lester v. Chater, 81 F.3d 821, 830 (9th Cir.

9    1995).  Ordinarily, more weight is given to the opinion of a treating professional, who has a

10   greater opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80

11   F.3d 1273, 1285 (9th Cir. 1996).

12             To evaluate whether an ALJ properly rejected a medical opinion, in addition to

13   considering its source, the court considers whether (1) contradictory opinions are in the record,

14   and (2) clinical findings support the opinions.  An ALJ may reject an uncontradicted opinion of a

15   treating or examining medical professional only for "clear and convincing" reasons.  Lester, 81

16   F.3d at 831.  In contrast, a contradicted opinion of a treating or examining professional may be

17   rejected for "specific and legitimate" reasons that are supported by substantial evidence.  Id. at

18   830.  While a treating professional's opinion generally is accorded superior weight, if it is

19   contradicted by a supported examining professional's opinion (e.g., supported by different

20   independent clinical findings), the ALJ may resolve the conflict.  Andrews v. Shalala, 53 F.3d

21   1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  In

22   any event, the ALJ need not give weight to conclusory opinions supported by minimal clinical

23   findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999) (treating physician's conclusory,

24   minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a

25   non-examining professional, without other evidence, is insufficient to reject the opinion of a

26   treating or examining professional.  Lester, 81 F.3d at 831.

27   /////

28   /////

13

1          1.     Dr. Sahagian

Dr. Sahagian was one of plaintiff's treating physicians for three years, and examined plaintiff every 3 months during that period.  AT 748.  On July 24, 2012, Dr. Sahagian issued a medical source statement regarding plaintiff's physical impairments.  AT 748-52.  In this statement, Dr. Sahagian noted that plaintiff exhibited chronic pain in her right upper and lower extremities and lower back.  AT 748.  He determined that the plaintiff's pain was "severe" when plaintiff was not using medication.  Id.  Dr. Sahagian also noted that plaintiff exhibited a significant reduction in her range of motion in all directions and an abnormal gait.  AT 749.  Dr. Sahagian diagnosed plaintiff with CRPS, repaired torn elbow tendon, and chronic low back pain.  AT 748.  Dr. Sahagian opined that plaintiff's impairments have lasted at least 12 months or could be expected to last at least 12 months.  AT 750.  However, he determined that plaintiff's prognosis was "fair."  Id.

With respect to plaintiff's ability to perform work-related activities, Dr. Sahagian opined that plaintiff would be unable to have any contact with the public, complete detailed or complicated tasks, work under strict deadlines, or engage in fast-paced tasks such as production line work.  AT 749.  Dr. Sahagian also opined that plaintiff's impairments were severe enough to "frequently" interfere with her ability to concentrate to the degree necessary to perform simple work tasks.  Id.  With regard to functional limitations, Dr. Sahagian opined that plaintiff was able to sit for no more than 5 minutes and stand for no more than 10 minutes at a time without rest.  AT 750.  With respect to plaintiff's ability to walk, he opined that plaintiff could not walk the length of a single block without rest or severe pain.  Id.  Overall, he opined that plaintiff could sit, stand, and walk for about 2 hours total each in an 8-hour workday.  Id.  He also opined that plaintiff could rarely lift less than 10 pounds, twist, stoop, bend, crouch/squat, and climb ladders and stairs.  AT 751.

Dr. Sahagian determined that plaintiff could grasp, turn, and twist objects and engage in fine finger manipulations with her right upper extremity for up to 1 hour per workday.  Id.  He further determined that plaintiff could engage in overhead reaching with her right arm for up to 2 hours per workday.  Id.  Finally, he determined that plaintiff could engage in these same activities

14

1   for up to 8 hours per workday with her left upper extremity.  Id.

2       Based on these limitations, Dr. Sahagian opined that plaintiff would need a job that

3   permits shifting positions at will from sitting, standing, or walking.  AT 750.  He also opined that

4   plaintiff would need to take unscheduled breaks for 3 to 5 minutes every 15 to 20 minutes during

5   the course of an 8-hour workday.  AT 750-51.  Finally, he opined that plaintiff's impairments

6   would likely cause her to be absent from work 3 or more days per month.  Id.

7       The ALJ assigned Dr. Sahagian's opinion "no weight" because Dr. Sahagian's own

8   treatment notes did not support the degree of pain and disability he opined in his medical source

9   statement, plaintiff's behavior at the hearing contradicted some of the limitations he opined, and

10  there was limited medical evidence in the record to support Dr. Sahagian's functional

11  determinations.  AT 19-20.  The ALJ further stated that while he agreed that plaintiff has

12  limitations in her upper right extremity that restrict her from performing work above shoulder

13  level, he would not credit the other limitations Dr. Sahagian opined with regard to plaintiff's right

14  upper extremity, or any limitations attributed to plaintiff's claimed lower back and right leg

15  impairments.  AT 22.

16      Dr. Sahagian's treatment notes throughout the three-year period he was plaintiff's primary

17  physician suggest limitations far less severe than those opined by Dr. Sahagian in his July 24,

18  2012 opinion.  For instance, in a treatment note dated March 8, 2011, Dr. Sahagian stated that he

19  had reviewed an MRI of plaintiff's back and found it to be "fairly unremarkable."  AT 619.

20  Similarly, he stated in a note dated April 26, 2011 that an EMG of plaintiff's lower extremity was

21  negative and that the MRI of plaintiff's back "showed slight spinal stenosis at L3-4."  AT 659.

22  Dr. Sahagian also noted that "[t]hese findings really should not account for [the] pain and drama"

23  plaintiff expressed to him regarding the impact of her impairments.  Id.  He also consistently

24  found throughout the course of his treatment of plaintiff that plaintiff had "5/5 [leg] strength,

25  good reflexes, [and] negative leg lifts."  AT 470, 473, 619, 659.  Nevertheless, in his July 24,

26  2012 opinion, Dr. Sahagian opined that plaintiff could sit for only 10 minutes and walk for 3

27  minutes at a time, indicating that plaintiff has extreme impairments in her back and lower

28  extremities.  AT 750.  The ALJ relied on such discrepancies between Dr. Sahagian's treatment

15

1   notes and his opinion in support of his determination that Dr. Sahagian's opinions regarding

2   plaintiff's lower back and leg impairments were entitled to "no weight." AT 19, 22.  This was a

3   specific and legitimate reason for discounting Dr. Sahagian's opinion that was based on

4   substantial evidence.  Tommasetti, 533 F.3d at 1041 (holding that incongruities between a

5   treating physician's objective medical findings and that physician's opinion constitute specific

6   and legitimate reasons for the ALJ to reject that physician's opinion); see also Rollins, 261 F.3d

7   at 856 (holding that the ALJ properly discounted treating physician's functional recommendations

8   that "were so extreme as to be implausible and were not supported by any findings made by any

9   doctor," including the treating physician's own findings).

10       Dr. Sahagian's treatment notes also indicate that he found plaintiff's complaints of pain

11  throughout his time treating her to be largely exaggerated.  See, e.g., AT 619 ("I do not see

12  anything that would explain the degree of pain and disability that she describes."), 659

13  ("Somehow I am not surprised that she states that the epidural actually made her low back pain

14  worse. . . . [The clinical] findings really should not account for such pain and drama.").

15  Furthermore, he noted that plaintiff showed "significant improvement in her overall well-being,

16  her mood, and much less pain" when he had her take medication for her impairments.  AT 814.

17  However, several of the extreme limitations he opined in his medical source statement, in

18  particular, his opinion that plaintiff could not sit for more than 5 minutes at a time, appear to more

19  closely reflect plaintiff's subjective complaints, which the ALJ properly rejected for the reasons

20  set forth below, than they do Dr. Sahagian's own clinical findings.  See Tommasetti, 533 F.3d at

21  1041 (finding that an adverse credibility determination regarding the claimant's testimony

22  supported the ALJ's rejection of physician's opinion that appeared to be primarily based on the

23  claimant's subjective comments concerning his condition).  Accordingly, it was proper for the

24  ALJ to rely on the discrepancies between Dr. Sahagian's clinical findings and his opinion

25  regarding the impact of plaintiff's impairments on her ability to perform certain work-related

26  functions as a basis to find his opinion to lack credibility.

27       Furthermore, much of the other medical evidence in the record conflicts with Dr.

28  Sahagian's opinion regarding plaintiff's functional capacity.  In particular, plaintiff's examining

physician, Dr. Otani, independently examined plaintiff and opined functional limitations that were overall less severe than those expressed by Dr. Sahagian.  Dr. Otani opined that plaintiff did not exhibit any signs of CRPS after each of his two examinations, and opined in his Social Security Disability Evaluation form that plaintiff was capable of sitting for up to two hours at a time based on clinical findings similar to those found by Dr. Sahagian.  AT 546, 840.  He also found that plaintiff had a "normal gait," was "able to heel walk, toe walk, and tandem walk," and able to get up from her chair and onto the examination table without difficulty.  AT 546. Similarly, the State Agency consulting physicians who reviewed plaintiff's medical records also found plaintiff to be far less functionally limited than Dr. Sahagian.  AT 550-55, 558. The ALJ's reliance on the contradictions between Dr. Sahagian's opinion and the other medical evidence in the record constituted another specific and legitimate reason for assigning "no weight" to his opinion.  See Andrews, 53 F.3d at 1041; Lester, 81 F.3d at 831 (holding that while "[t]he opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of . . . a treating physician," it may be used by the ALJ to support his RFC determination when the opinion reflects other objective medical evidence in the record).

Because the ALJ gave multiple specific and legitimate reasons for assigning "no weight" to Dr. Sahagian's opinion that were supported by substantial evidence in the record,[4] the ALJ did not err in addressing this opinion when determining plaintiff's RFC.

2.   Dr. Otani

Dr. Otani gave plaintiff a physical examination on October 21, 2010.  AT 545-47.  During this examination, Dr. Otani noted that the range of motion in plaintiff's right shoulder was limited, but that "all other joints [were] without gross evidence of tenderness, effusion or instability."  AT 546.  He also noted that outside of tenderness in the right upper extremity, plaintiff exhibited "no skin changes" and exhibited "equal and symmetrical" peripheral pulses

---

[4] Because substantial evidence supported the ALJ's reasoning that Dr. Sahagian's opinion was contrary to the other medical evidence in the record and his own clinical findings, the court will not address his additional reasons for assigning diminished weight to Dr. Sahagian's opinion.

1   and temperature in her extremities.  Id.  Dr. Otani found that plaintiff had a "normal gait and

2   station," and exhibited the ability to "heel walk, toe walk, and tandem walk," and to get up from a

3   chair and onto an exam table.  Id.  He also determined that plaintiff had 5/5 grip strength in her

4   left upper extremity and 4/5 grip strength in her right upper extremity.  Id.  Dr. Otani also noted

5   that plaintiff "is independent in areas of mobility and activities of daily living."  AT 545.

6        As part of this examination, Dr. Otani reviewed plaintiff's prior medical records,

7   including records from the Feather River Health Clinic that noted that plaintiff suffered from

8   CRPS in her right upper extremity.  AT 546.  While Dr. Otani noted plaintiff's complaints of

9   pain, he determined that those "complaints appear to be greater than the objective findings" and

10  that "[t]here is no clinical evidence of the claimed [CRPS] of the right upper extremity."  AT 547.

11  He also noted that a review of an x-ray report for plaintiff's back showed that plaintiff had a

12  "mild disk [sic] space narrowing," which confirmed that plaintiff was exaggerating when she

13  "stated that she had [a] compound fracture at L4-5."  Id.

14       Based on these findings, Dr. Otani opined that plaintiff had the ability to sit for up to 2

15  hours at a time, and for a total of up to 6 hours in an 8-hour workday; stand for up to 1 hour at a

16  time, and for a total of up to 4 hours in an 8-hour workday; and lift and carry up to 10 pounds

17  frequently and 15 pounds occasionally.  AT 547.  He further opined that plaintiff could not do any

18  overhead work with her right upper extremity.  Id.

19       The ALJ concluded that Dr. Otani's clinical examination findings supported the ALJ's

20  RFC determination, but did not credit his opinion regarding plaintiff's functional restrictions

21  because "they are not supported by his examination findings, or other evidence in the case

22  record."  AT 19.  This was a specific and legitimate reason for discounting Dr. Otani's opinion

23  that was supported by substantial evidence in the record.

24       While Dr. Otani opined restrictions were less severe than those opined by Dr. Sahagian,

25  Dr. Otani's determinations regarding the limitations on plaintiff's ability were still more severe

26  than Dr. Otani's own clinical findings suggest.  For example, Dr. Otani found during his

27  examination that plaintiff had a normal range of motion and strength in her extremities, with the

28  exception of her right upper extremity, which the ALJ took into account in his RFC

1    determination.  AT 17, 546.  He also found that "[e]xcluding right shoulder, all other joints are

2    without gross evidence of tenderness, effusion or instability."  Id.  He noted further that plaintiff

3    had a "normal gait and station," could "heel walk, toe walk, and tandem walk," and could get up

4    from a chair and onto an exam table with no noted problems.  Id.  He also highlighted that

5    plaintiff appeared to exaggerate and alleged symptoms more severe than those documented by the

6    medical findings.  AT 574.  Despite these largely normal findings and plaintiff's exaggerations,

7    however, he found that plaintiff could only stand for up to 1 hour and sit for no more than 2 hours

8    at a time.  Id.  It was the ALJ's prerogative to determine that the apparent incongruities between

9    Dr. Otani's medical findings and certain aspects of his functional opinion warranted the

10   assignment of diminished weight portions of Dr. Otani's opinion.  See Tommasetti, 533 F.3d at

11   1041.  Accordingly, the ALJ did not error in assigning diminished weight to particular aspects of

12   Dr. Otani's opinion on this basis.

13           Plaintiff asserts in her reply brief that the ALJ should not have considered Dr. Otani's

14   more mild clinical findings as a basis for discounting his opinion regarding plaintiff's functional

15   capacity because the nature of plaintiff's CRPS meant that Dr. Otani's clinical findings were

16   temporary and did not reflect the actual severity of plaintiff's impairments and pain.  However,

17   for the reasons stated above, the ALJ properly assessed plaintiff's claim that she had CRPS and

18   made a determination that she did not have this syndrome, which was supported by substantial

19   evidence in the record.

20           Furthermore, Dr. Otani specifically noted in his opinion that he did not find any clinical

21   signs that plaintiff had CRPS and did not diagnose plaintiff with CRPS.[5]  AT 547.  Nor did he

22   provide any indication that the functional restrictions he opined were more severe due to the

23   possibility that plaintiff may suffer from CRPS.  Therefore, there was no need for the ALJ to take

24   into account plaintiff's alleged CRPS when considering Dr. Otani's opinion because Dr. Otani

25   himself found that plaintiff did not suffer from the syndrome.

26

27   _____
     [5] Dr. Otani reiterated his opinion that plaintiff did not exhibit any signs of CRPS when he
     examined plaintiff again on May 11, 2011, over six months after his initial determination.  AT
28   840.

1    In sum, the ALJ's RFC determination was based on proper consideration of the medical

2    evidence in the record and was supported by substantial evidence.  Accordingly, the ALJ did not

3    err in assessing plaintiff's RFC.

4              F.      The ALJ Properly Assessed Plaintiff's Testimony

5              Sixth, plaintiff argues that the ALJ improperly found plaintiff's testimony to lack

6    credibility.  This contention is without merit.

7              The ALJ determines whether a disability applicant is credible, and the court defers to the

8    ALJ's discretion if the ALJ used the proper process and provided proper reasons.  See, e.g.,

9    Saelee v. Chater, 94 F.3d 520, 522 (9th Cir. 1995).  If credibility is critical, the ALJ must make an

10   explicit credibility finding.  Albalos v. Sullivan, 907 F.2d 871, 873-74 (9th Cir. 1990); Rashad v.

11   Sullivan, 903 F.2d 1229, 1231 (9th Cir. 1990) (requiring explicit credibility finding to be

12   supported by "a specific, cogent reason for the disbelief").

13             In evaluating whether subjective complaints are credible, the ALJ should first consider

14   objective medical evidence and then consider other factors.  Bunnell v. Sullivan, 947 F.2d 341,

15   344 (9th Cir. 1991) (en banc).  If there is objective medical evidence of an impairment, the ALJ

16   then may consider the nature of the symptoms alleged, including aggravating factors, medication,

17   treatment and functional restrictions.  See id. at 345-47.  The ALJ also may consider: (1) the

18   applicant's reputation for truthfulness, prior inconsistent statements or other inconsistent

19   testimony, (2) unexplained or inadequately explained failure to seek treatment or to follow a

20   prescribed course of treatment, and (3) the applicant's daily activities.  Smolen v. Chater, 80 F.3d

21   1273, 1284 (9th Cir. 1996); see generally SSR 96-7P, 61 FR 34483-01; SSR 95-5P, 60 FR 55406-

22   01; SSR 88-13.  Work records, physician and third party testimony about nature, severity and

23   effect of symptoms, and inconsistencies between testimony and conduct also may be relevant.

24   Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997).  A failure to seek

25   treatment for an allegedly debilitating medical problem may be a valid consideration by the ALJ

26   in determining whether the alleged associated pain is not a significant nonexertional impairment.

27   See Flaten v. Secretary of HHS, 44 F.3d 1453, 1464 (9th Cir. 1995).  The ALJ may rely, in part,

28   on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458 (9th Cir.

20

1989), which cannot substitute for medical diagnosis.  Marcia v. Sullivan, 900 F.2d 172, 177 n.6 (9th Cir. 1990).  "Without affirmative evidence showing that the claimant is malingering, the Commissioner's reasons for rejecting the claimant's testimony must be clear and convincing."  Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir. 1999).

Here, the ALJ found plaintiff's testimony regarding the severity of her impairments not credible based on his own observations of plaintiff at the hearing, plaintiff's inconsistent statements concerning drug use, and the existence of medical evidence in the record indicating that plaintiff exaggerated her symptoms.  AT 20-21.  These were valid reasons for discounting plaintiff's testimony that were supported by substantial evidence in the record.

Plaintiff argues that the ALJ's use of his own observations of plaintiff from the administrative hearing as a reason in support of his credibility finding was improper "sit and squirm" reasoning.  To the contrary, "the adjudicator may also consider his or her own recorded observations of the individual as part of the overall evaluation of the credibility of the individual's statements."  SSR 96-7p, 1996 WL 374186; see also Quang Van Han, 882 F.2d at 1458 (holding that the ALJ's observations of the claimant's behavior at the administrative hearing "constitute[d] the requisite 'specific findings'" to justify the ALJ's conclusion that the claimant was "overdramatizing his feelings of pain").  Here, the ALJ used his own personal observations regarding plaintiff's ability to sit comfortably during the hearing for a period of time larger than the 8 to 10 minutes plaintiff alleged she could sit as a result of her impairments.  AT 19, 35.  Furthermore, he found plaintiff's "responses to questions to be rambling and at times unresponsive" and that plaintiff "appeared to exaggerate her symptoms."  AT 21 (emphasis omitted).  These findings were supported by the transcript from the administrative hearing, which reflects that plaintiff's answers to a number of the ALJ's questions were rambling, unresponsive, and indicated exaggeration on plaintiff's part regarding the severity of her impairments.  See AT 41-46.

Similarly, the ALJ relied on the inconsistencies in plaintiff's testimony and statements to her physicians in the record regarding her past use of marijuana as a basis for finding her not credible.  During the administrative hearing, plaintiff testified that she had not smoked marijuana

"for years" and that she had tried it for a period of "three to six months . . . and then . . . did not use it any longer." AT 40. However, plaintiff's statements made to her physicians in the record appear inconsistent with these assertions. In September of 2009, plaintiff told Dr. Filibrandt that she smoked "2 joints" per week in order to calm her nerves. AT 362, 365. However, during a psychiatric examination in January of 2011, plaintiff "denie[d] any drug usage ever." AT 560. Despite this statement of non-use, in June of 2011, plaintiff provided a "crisis assessment" form to the Butte County Department of Behavioral Health stating that she "smoke[s] marijuana once in a while." AT 634. Similarly, plaintiff's treatment notes from plaintiff's physicians throughout the relevant time period indicate that plaintiff used marijuana at least until a couple months prior to the administrative hearing. See, e.g., AT 562, 705, 713-14, 720, 727, 734, 738, 756, 763, 771, 799, 803, 823, 839, 842.[6] These inconsistent statements regarding plaintiff's marijuana use constituted substantial evidence in support of the ALJ's determination that plaintiff was less than credible in her testimony regarding the intensity of her pain and limiting effects of her impairments. See Thomas v. Barnhart, 278 F.3d 947, 959 (9th Cir. 2002) (holding that the ALJ's reasoning that the claimant's lack of candor regarding her drug and alcohol use "carrie[d] over to her description of physical pain" supported the ALJ's finding the claimant's testimony was not credible). The ALJ's reliance on this evidence properly supported his negative credibility determination.

Finally, the ALJ relied in part on the clinical findings and statements in the record made by plaintiff's physicians indicating that plaintiff exaggerated the severity of many of her impairments. For instance, Dr. Otani noted on April 26, 2011, that plaintiff demonstrated "multiple inconsistencies in her physical examination which are non-physiologic" and that

---

[6] As noted above, plaintiff argues in her reply that the "problem lists" included in the medical records provided by Feather River Clinic reflect only that plaintiff suffered from a particular problem at some point during her time under the Clinic's care and that the Clinic would continue to list the same problems even if plaintiff no longer experienced them unless plaintiff specifically requested those problems be removed from future reports. ECF No. 15 at 29. However, as stated earlier, there is no evidence in the administrative record that was before the ALJ that this was the Clinic's practice. Nor is there any evidence in the record beyond plaintiff's own testimony that she did not use marijuana more recently than one year prior to the administrative hearing.

plaintiff's "subjective complaints appear to be greater than object of [sic] findings."  AT 650.

While plaintiff is correct in noting that an ALJ may not rely solely on the lack of objective

medical findings to discredit a claimant, see Thomas, 278 F.3d at 960, the ALJ in this case used

the medical evidence in the record that conflicted with plaintiff's allegations concerning the

severity of her symptoms to corroborate his determination that plaintiff's testimony was

exaggerated, rather than relying on it as the sole basis for his credibility finding.  Because the ALJ

provided other clear and convincing reasons for finding plaintiff not credible, the ALJ's

discussion of inconsistencies between plaintiff's testimony and the findings of her treating and

examining doctors in the medical record as an additional reason for finding plaintiff not credible

was not in error.  Burch, 400 F.3d at 681 ("Although lack of medical evidence cannot form the

sole basis for discounting pain testimony, it is a factor that the ALJ can consider in his credibility

analysis.").

Because the ALJ provided clear and convincing reasons for finding plaintiff's testimony

regarding the severity of her impairments not credible that were based on substantial evidence in

the record, the ALJ did not err in his credibility determination.

G.      The ALJ Properly Assessed Plaintiff's Sister's Testimony

Plaintiff also argues that the ALJ improperly discounted plaintiff's sister's testimony.

"[L]ay witness testimony as to a claimant's symptoms or how an impairment affects

ability to work is competent evidence, and therefore cannot be disregarded without comment."

Nguyen v. Chater, 100 F.3d 1462, 1467 (9th Cir. 1996); see also Dodrill v. Shalala, 12 F.3d 915,

918-19 (9th Cir. 1993) (friends and family members in a position to observe a plaintiff's

symptoms and daily activities are competent to testify to condition).  "If the ALJ wishes to

discount the testimony of the lay witnesses, he must give reasons that are germane to each

witness."  Dodrill, 12 F.3d at 919.

Here, the ALJ determined plaintiff's sister's testimony "add[ed] little to the analysis" on

the basis that it "simply echo[ed]" plaintiff's complaints.  (AT 22.)  This was a germane reason

for dismissing the testimony of plaintiff's sister.

/////

23

1    Plaintiff's sister's testimony at the administrative hearing regarding the extent of the

2  limitations plaintiff's impairments imposed on her largely mirrored that expressed in plaintiff's

3  own testimony.  For instance, both testified that plaintiff could not use her right arm, could not

4  shower without assistance, and had problems getting down stairs and ambulating around her

5  house without assistance.  AT 50-53, 66-68.  Plaintiff argues that plaintiff's sister did not merely

6  "echo" plaintiff's testimony because she testified as to certain observations she had made

7  regarding plaintiff's activities, such as plaintiff's difficulties with cooking and drinking coffee,

8  that were not mentioned by plaintiff in her own testimony.  However, such additional

9  observations do not undermine the ALJ's determination that plaintiff's sister's testimony was

10  substantially similar to plaintiff's testimony because plaintiff's sister's additional anecdotes

11  merely relate the same complaints of pain expressed by plaintiff in her own testimony.  With

12  respect to characterizing the extent of the limitations imposed by plaintiff's impairments,

13  plaintiff's testimony and plaintiff's sister's testimony were substantially similar.

14    Because the ALJ provided clear and convincing reasons for rejecting plaintiff's own

15  subjective complaints and plaintiff's sister provided testimony largely expressing those same

16  complaints, the ALJ's rejection of plaintiff's sister's testimony on the basis of this similarity was

17  not in error.  See Valentine v. Comm'r Soc. Sec. Admin., 574 F.3d 685, 694 (9th Cir. 2009) ("In

18  light of our conclusion that the ALJ provided clear and convincing reasons for rejecting [the

19  claimant's] own subjective complaints, and because [plaintiff's wife's] testimony was similar to

20  such complaints, it follows that the ALJ also gave germane reasons for rejecting her testimony.").

21    H.    The ALJ's Step Five Determination was Without Error

22    Finally, plaintiff contends the ALJ failed to include all of plaintiff's limitations in the

23  hypotheticals relied on by the ALJ in finding there were a significant number of jobs which

24  plaintiff can perform.  Specifically, plaintiff argues that the ALJ's hypothetical failed to reflect

25  plaintiff's mental impairments of bipolar disorder and depression.  Plaintiff's argument lacks

26  merit.

27    Hypothetical questions posed to a vocational expert must set out all the substantial,

28  supported limitations and restrictions of the particular claimant.  Magallanes v. Bowen, 881 F.2d

24

1   747, 756 (9th Cir. 1989).  If a hypothetical does not reflect all the claimant's limitations, the

2   expert's testimony as to jobs in the national economy the claimant can perform has no evidentiary

3   value.  DeLorme v. Sullivan, 924 F.2d 841, 850 (9th Cir. 1991).  While the ALJ may pose to the

4   expert a range of hypothetical questions, based on alternate interpretations of the evidence, the

5   hypothetical that ultimately serves as the basis for the ALJ's determination must be supported by

6   substantial evidence in the record as a whole.  Embrey v. Bowen, 849 F.2d 418, 422-23 (9th Cir.

7   1988).

8      Here, the ALJ posed hypotheticals to the VE based on the limitations reflected in his RFC

9   determination, which was based on substantial evidence for the reasons stated above.  Also as

10   noted above, the mental limitations plaintiff asserts the ALJ improperly omitted from his

11   hypotheticals were not omitted in error because the ALJ properly determined at earlier steps of

12   the analysis that plaintiff failed to prove their existence.  Accordingly, the ALJ did not err in

13   posing hypotheticals to the VE at step five.  See Rollins, 261 F.3d at 857 ("Because the ALJ

14   included all of the limitations that he found to exist, and because his findings were supported by

15   substantial evidence, the ALJ did not err in omitting the other limitations that [the claimant] had

16   claimed, but had failed to prove.").

17   CONCLUSION

18      For the reasons stated herein, IT IS HEREBY RECOMMENDED that:

19      1.  Plaintiff's motion for summary judgment (ECF No. 13) be denied;

20      2.  The Commissioner's cross-motion for summary judgment (ECF No. 14) be granted;

21   and

22      3.  Judgment be entered for the Commissioner.

23      These findings and recommendations are submitted to the United States District Judge

24   assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within fourteen

25   days after being served with these findings and recommendations, any party may file written

26   objections with the court and serve a copy on all parties.  Such a document should be captioned

27   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

28   shall be served and filed within ten days after service of the objections.  The parties are advised

1   that failure to file objections within the specified time may waive the right to appeal the District

2   Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3   Dated:  April 27, 2015

4   _____
    CAROLYN K. DELANEY

5   UNITED STATES MAGISTRATE JUDGE

6

7

8

9   11 Cannon.ss

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28